| | |
|---|---|
| Allstate Insurance Company and Allstate Indemnity Company,<br>    *Plaintiffs*,<br><br>      *v.*<br><br>Advanced Health Professionals, P.C., Health Plus, Inc., Felix Almentero, M.D., Maria Passaro-Henry, M.D., Robert Goldring, D.C., Reuben Malkiel, D.C., Melissa Malkiel, R.P.T., and Richard Mullin, D.C.,<br>    *Defendants*. | Civil No. 3:08cv63 (JBA)<br><br><br><br><br><br><br>December 17, 2008 |

## RULING ON DEFENDANTS' MOTION TO DISMISS

### I.      Background

Plaintiffs Allstate Insurance Company and Allstate Indemnity Company (collectively, "Allstate" or "Plaintiffs") brought this action on January 14, 2008 against Advanced Health Professionals, P.C. ("AHP") as well as its related management company and its individual owners, operators and employees, alleging that they violated state and federal laws by engaging in a scheme to defraud Allstate by creating and submitting false, fraudulent and inflated medical invoices through the United States Mail for reimbursement from Allstate. In particular, Plaintiffs bring claims under the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 ("RICO"), the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110(b) ("CUTPA"), and the Connecticut Health Insurance Fraud Act, Conn. Gen. Stat. § 53-442 ("CHIFA"), and also allege common-law fraud.  (Amended

Complaint [Doc. # 66] ("Am. Compl.") at ¶¶ 974–1022.)  Plaintiffs seek injunctive relief as well as compensatory, punitive and statutory damages.  (*Id.* at pp. 140–42.)

Defendants have moved to dismiss Plaintiffs' Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), arguing: (1) that as to Plaintiffs' RICO and common law fraud claims, Plaintiffs have failed to state a claim upon which relief can be granted because they have not pleaded false or fraudulent statements; (2) that as to each of Plaintiffs' claims, Plaintiffs have not pleaded fraud with the particularity required by Rule 9(b); (3) that to the extent Plaintiffs' RICO claims are based on invoices submitted by Defendants before January 14, 2004, and to the extent Plaintiffs' state-law claims are based on invoices submitted by Defendants before January 14, 2005, those claims are barred by applicable statutes of limitations; (4) that Plaintiffs' innocent victim enterprise RICO claim (Count II) fails to state a claim upon which relief can be granted because Defendants did not participate in the operation or management of Allstate's affairs; and (5) that Plaintiffs' mail-fraud RICO claim (Count I) fails to state a claim upon which relief can be granted because it violates the "separateness" requirement of § 1962(c).  (*See* Defs.' Mem. Supp. Mot. Dismiss [Doc. # 68] ("Defs.' Mem. Supp.").)

For the reasons that follow, the Court grants Defendants' motion to dismiss Allstate's complaint under Rule 9(b).  Because it grants Defendants' motion without giving Allstate leave to amend its complaint, the Court does not address Defendants' arguments that Allstate's complaint should be dismissed for any of the following grounds: for failure to state

a claim upon which relief can be granted because it does not plead false or fraudulent statements; as untimely given the applicable statutes of limitations; for failure to plead facts sufficient to find that Defendants participated in the operation or management of Allstate's affairs; or for violation of the "separateness" requirement in § 1962(c).

## II.     Sufficiency of the Complaint Under Rule 9(b)

### A.     Standards

In ruling on a motion to dismiss, the Court "must accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). Although under Federal Rule of Civil Procedure 8(a)(2) a complaint need only contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007) (citations omitted), a complaint alleging fraud must contain a greater level of factual specificity than that required under the requirements of Rule 8(a)(2) and *Twombly*. Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To survive a motion to dismiss under Rule 9(b), "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain

why the statements were fraudulent.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993)). "Allegations that are conclusory or unsupported by factual assertions are insufficient" to satisfy Rule 9(b). *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Knoll v. Schectman*, 275 F. App'x 50, 51 (2d Cir. 2008) (affirming dismissal under Rule 9(b) because complaint contained only "the kind of conclusory allegations that Rule 9(b) is meant to dissuade").

While the "conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), courts "must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a 'license to base claims of fraud on speculation and conclusory allegations,'" *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (citations omitted). Therefore, "it is well established that a plaintiff must still allege facts that give rise to a *strong inference of fraudulent intent*," *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999) (quotations omitted, emphasis in original), either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness," *Lerner*, 459 F.3d at 290–91.

Allstate alleges that Defendants "engaged in a scheme to defraud Allstate" by submitting fraudulent requests for payment to Allstate. (*See* Am. Compl. at ¶ 1 ("This is a case about [Defendants] who working in concert engaged in a scheme to defraud Allstate");

4

*id.* at ¶ 5 ("In each claim detailed throughout this Complaint, an Allstate automobile insurance contract was the platform upon which [D]efendants perpetrated their fraudulent scheme.")[1] As a result, Rule 9(b) applies to each of Plaintiffs' claims.[2] *See generally Frota v. Prudential-Bache Secs., Inc.*, 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986) ("Rule 9(b) extends to all averments of fraud or mistake, whatever may be the theory of legal duty—statutory, common law, tort, contractual, or fiduciary.").[3]

---

[1] Each of Plaintiffs' six claims is predicated on allegations that Defendants engaged in fraud. (*See* Am. Compl. at ¶¶ 974–89 (alleging that Defendants engaged in mail fraud, a RICO violation, "in furtherance of their scheme to defraud"); *id.* at ¶¶ 990–1003 (alleging that Defendants engaged in an innocent victim enterprise, a RICO violation, by "exert[ing] control over Allstate through the commission of the instant fraud scheme"); *id.* at ¶¶ 1004–08 (alleging that Defendants conspired to violate RICO by committing mail fraud and engaging in an innocent victim enterprise, as described above); *id.* at ¶¶ 1009–14 (alleging that Defendants defrauded Allstate); *id.* at ¶¶ 1015–18 (alleging that Defendants violated CUTPA through their "fraudulent medical billing practices"); *id.* at ¶¶ 1019–22 (alleging that Defendants violated CHIFA by "submitt[ing] hundreds of false written statements and invoices . . . with the intent to cause Allstate to pay them money").)

[2] The additional authority to which Plaintiffs have pointed (*see* Pls.' Notice of Add'l Authority [Doc. # 103]) addresses only Federal Rule 12(b)(6) and does not address the sufficiency of the complaint in that case under Rule 9(b). *See Allstate Ins. Co. v. Weir*, No. 5:07-CV-498-D, 2008 WL 4877047, 2008 U.S. Dist. LEXIS 91270 (E.D.N.C. Nov. 10, 2008) (denying, under Rule 12(b)(6), motion to dismiss complaint raising claims under RICO, state-law RICO, state-law fraudulent incorporation, and common law fraud).

[3] *See also Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172 (2d Cir. 1999) (Rule 9(b) applies to RICO claims where "fraud is the predicate illegal act" underpinning that claim); *Olsen v. Pratt & Whitney Aircraft, a Div. of United Techs. Corp.*, 136 F.3d 273, 276 (2d Cir. 1998) (Rule 9(b) applies to Connecticut common law fraud claims); *Lentini v. Fidelity Nat'l Title Ins. Co. of New York*, 479 F. Supp. 2d 292, 298 & n.2 (D. Conn. 2007) (Rule 9(b) applies to CUTPA claims that "rely on affirmative statements or omissions involving fraud or mistake"); Conn. Gen. Stat. § 53-544 (requiring an insurer to be "aggrieved as a result of an act of insurance fraud" in order to bring suit); *Thal v.*

Defendants argue that the Amended Complaint "lacks the key element of specificity" because "[t]he Complaint utterly fails to address <u>why the medical documentation was false</u> other than to opine that treatment was unnecessary which . . . does not cross the threshold of fraud or falsity as a matter of law." (Defs.' Mem. Supp. at 14 (emphasis in original).) Instead, Defendants maintain, the Amended Complaint reflects that Allstate considers the quality of treatment rendered by Defendants, the payments for which Defendants submitted the exemplar claims to Allstate, to be "below Allstate's invisible, unspecified standard" of quality and having failed to object to such treatment at the time the exemplar claims were submitted, Allstate now seeks to recover money it paid for these unobjected-to exemplar claims by mischaracterizing them as "false" in this action. (*Id.* at 14–15.) Because the Amended Complaint "contains no allegations as to the reasons why each claim was false," Defendants argue, Allstate's complaint relies on "the conclusory terms 'false' [and] 'fraudulent'" and "contains no allegations as to the reasons why each claim was false" (*id.* at 15–16), such that its allegations are not sufficiently specific to satisfy Rule 9(b)'s requirement that the complaint "explain why the [exemplar claims submitted to Allstate] were fraudulent."

Allstate responds that the "Amended Complaint contains specific detail retarding the fraudulent nature of each claim at issue in this case," citing to the 888 paragraphs

*Berkshire Life Ins. Co.*, No. 3:98CV11 (AHN), 1999 WL 200697, *3, 1999 U.S. Dist. LEXIS 4891, *8 (D. Conn. Mar. 24, 1999) (explaining that "CHIFA punishes intentional fraud or deceit").

constituting the allegations of the 79 exemplar claims. (Pls.' Opp'n at 24 (citing Am. Compl. at ¶¶ 61–949).) Allstate also argues that "[D]efendants' medical records were also false because of the (false) impairment ratings contained therein" (*id.*), which "lead[s] to the conclusion that such ratings were knowingly fabricated by [D]efendants to artificially enhance the settlement value of AHP patient claims" (*id.*), and that Defendants "create[d] the appearance that certain treatment was rendered when, in fact, it was not" (*id.* at 5 (citing Am. Compl. *passim*)). Allstate further argues that the Amended Complaint "alleges that the [D]efendants administered a battery of unnecessary diagnostic testing which amounted to nothing more than deleterious treatment, worthless services and treatment rendered solely to maximize profits" (*id.* at 5 (citing Am. Compl. *passim*)).

## B.     *The Amended Complaint Itself*

Although the Amended Complaint is extremely long, the Court can find no allegations of fact on which a conclusion of fraud, fraudulence, falsity, or misrepresentation could be based. It contains only conclusory allegations in lieu of the kinds of specific allegations necessary to survive Rule 9(b).

First, the Amended Complaint contains what Plaintiffs describe as "specific factual allegations" which "place [D]efendants on notice of the claims against them and permit them to file an Answer articulating any defenses, if any." (Pls.' Opp'n at 26.) At its most "specific" the Amended Complaint contains the following allegations regarding the falsity, fraudulence, or misrepresentative nature of the Defendants' submissions to Allstate

regarding the 79 exemplar claims; the italicized portions are those the Court concludes are factually unsupported:

- Defendants "*working in concert* engaged in a scheme to *defraud* Allstate, by creating and submitting for payment *false, fraudulent and inflated* medical invoices containing *false and excessive* charges . . . through the U.S. Mail" (Am. Compl. ¶ 1);

- "All of the acts and omissions of the [D]efendants" alleged in the complaint "were undertaken *intentionally*" (*id.* at ¶ 3);

- For each exemplar claim "an Allstate automobile insurance contract was the platform upon which [D]efendants perpetrated their *fraudulent* scheme" (*id.* at ¶ 5);

- Defendant Goldring was "the Owner and Registered Agent of Health Plus, Inc., the entity that generated and submitted for payment the *false* medical documentation upon which Allstate relied" (*id.* at ¶ 24);

- For each exemplar claim "[D]efendants created and submitted *false* medical documentation to Allstate . . . through the U.S. Mail demanding payment" (*id.* at ¶ 36);

- There are claims additional to the exemplar claims which "appear to bear the same pattern of *false* medical documentation" (*id.* at ¶ 37)

- "None of the testing identified in Exhibit 3 annexed hereto was compensible [*sic*] whereas the [D]efendants failed to assess a patient on his/her individual characteristics, subjective complaints and objective findings" (*id.* at ¶ 38);

- "The [D]efendants' *false* diagnostic testing was nothing more than a *worthless* service" (*id.* at ¶ 39);

- "The *false* diagnostic testing identified in Exhibit 3 was provided to" maximize profits or increase patients' medical bills (*id.* at ¶ 40);

- "The [D]efendants *mis*represented chiropractic manipulation (CPT Code 9586X) as manual therapy (CPT Code 97140) to *intentionally engage in* CPT Code unbundling, which allowed them to bill for services subsumed within CPT Code 98940-98943 (chiropractic

manipulation)" (*id.* at ¶ 42);

¶ "[T]he [D]efendants billed chiropractic manipulation as manual therapy (CPT Code 97140) to bundle CPT Codes 97140 and 97530 (therapeutic activities), *which is otherwise impermissible*" (*id.* at ¶ 43);

¶ "The [D]efendants made material *mis*representations of fact and engaged in *intentionally unfair and deceptive business practices by* creating and submitting" bills without employing proper CPT practices (*id.* at ¶ 45);

¶ "Many of the bills prepared and submitted by [D]efendants, under the [D]efendants' supervision and control, were submitted under *improper and/or deceptive* CPT Codes" (*id.* at ¶ 47);

¶ "The [D]efendants *falsely* documented permanent partial disability ratings to establish and/or enhance personal injury claims and settlements in cases involving Allstate" (*id.* at ¶ 50);

¶ In third-party cases "the *false* medical documentation was submitted via the U.S. Mail to Allstate" (*id.* at ¶ 54);

¶ "The [D]efendants' *false* medical documentation created the appearance that additional chiropractic, physical therapy and other treatments were medically necessary, thereby justifying additional treatment by [D]efendants; however, such additional treatment constituted *worthless* services designed to maximize profit *not treat Allstate claimants*" (*id.* at ¶ 55);

¶ "By creating and advancing such *false* medical documentation, [D]efendants continued to treat patients and receive payments for their alleged services" (*id.* at ¶ 56);

¶ "The [D]efendants continued to treat personal injury patients *on the basis of the false medical documentation*, until the limits of the patient's Medpay coverage had been reached or nearly reached" (*id.* at ¶ 57);

¶ "The *false* medical documentation was designed to substantiate a patient's subsequent claim for damages in connection with personal injury claims, settlements, and lawsuits" (*id.* at ¶ 58); and

¶ "The [D]efendants' *exaggerated, misrepresented and fabricated* reports . . . *artificially inflated* settlement values" (*id.* at ¶ 59).

Plaintiffs also allege that the exemplar claims—and, through them, Defendants' "systematic pattern and practice of unlawful acts"—each suffer from some or all the following eight problems:

1. "Creating and submitting inaccurate and/or deceptive documentation";

2. Authoring false reports containing fictional impairment ratings";

3. "Billing under a single license/entity to misrepresent nature of treatment rendered to patient and the doctor who provided the service";

4. "Rendering a recipe of treatment and/or procedures and/or examinations absent any individualized medical decision making";

5. "Rendering treatment and/or procedures unrelated to the severity of the diagnosed, or reasonably suspected, injury or condition allegedly incurred by the patient";

6. "Rendering treatment and testing solely for the purpose of enabling the patient to incur additional medical treatment expenses";

7. "Submitting invoices containing charges not supported by the patient's treatment records"; and

8. "Submitting invoices containing charges for treatments or procedures not fully rendered, or not rendered as represented by defendants."

(Am. Compl. ¶ 33.) Allstate alleges that the first, fourth, fifth, sixth, seventh, and eighth of these descriptions inhere to all of Defendants' 79 exemplar claims, that the third applies to all but one of the exemplar claims, and that the second one applies to 40 of the claims. (*See id.* at ¶¶ 61–949.) This correlation of the eight descriptions to the 79 exemplar claims is

repeated and summarized in the Evidence Allegation Chart.  (*Id.* at Ex. 1.)

The complaint then makes additional general allegations.  To the extent these allegations concern the content, or false, fraudulent, or misrepresentative nature of Defendants' submissions to Allstate, they are as follows (again with the conclusory portions of the allegations italicized):

- "The [D]efendants created, prepared and processed *false* medical documentation and intentionally violated the laws of the United States by, devising and intending to devise schemes to *defraud and* obtain money and property *by means of false and fraudulent pretenses* in representations" (Am. Compl. at ¶ 950);

- "The [D]efendants' *false* medical documentation was mailed to (1) Allstate and/or (2) the patients' personal injury counsel" (*id.* at ¶ 952);

- "The [D]efendants either personally used the mail to further the *fraudulent* scheme by causing *fraudulent* medical bills and records to be mailed to Allstate" or intended others to do the same (*id.* at ¶ 954);

- "The [D]efendants knew" that they and others would use the U.S. Mail "in connection with each of the *fraudulent* claims, including issuing payments based upon [D]efendants' *fraudulent* documentation" (*id.* at ¶ 955);

- "Allstate estimated that the [D]efendants' *fraudulent* medical billing scheme generated hundreds of mailings" (*id.* at ¶ 956)

- "The [D]efendants' *fraudulent* scheme went undetected until Allstate had sustained substantial injury.  The nature of [D]efendants' *fraudulent* scheme was *self-concealing by its very nature—false* medical reports and *false* invoices appearing legitimate on their face" (*id.* at ¶ 957);

- "The [D]efendants' *intentionally concealed* the *fraudulent* medical billing scheme from Allstate" (*id.* at ¶ 958);

- "At all relevant times, the [D]efendants acted with the *intent* to

conceal from Allstate their *mis*conduct in connection with the medical billing *fraud* scheme" (*id.* at ¶ 960);

- "The [D]efendants' ability to conceal the *fraudulent* scheme was enhanced by the position of trust medical providers are typically accorded in the transaction of medical insurance claims" (*id.* at ¶ 969);

- "The pattern of *fraudulent* conduct by the [D]efendants injured Allstate" in ways including "the loss of funds paid for *false and fraudulent (whether wholly fictitious or grossly inflated)* bills for services" (*id.* at ¶ 973);

- The individual Defendants "repeatedly and intentionally submitted *false and inflated* bills, reports, and other documents to Allstate for medical expenses and/or services *that were excessive, were not reasonable, were not necessary, and/or were of no therapeutic value to the patients*, to collect payment" (*id.* at ¶ 978);

- The individual Defendants' "pattern of *fraudulent* claims, each appearing legitimate on its face, also prevented Allstate from discovering the *fraudulent* scheme for a long period of time" (*id.* at ¶ 980);

- "The [D]efendants associated with Allstate by working in concert to create and submit *false* medical documentation to Allstate or others to whom Allstate became liable" (*id.* at ¶ 992);

- "The [D]efendants' scheme *to defraud Allstate* was dependent upon a succession of *mis*representations of material facts by the [D]efendants with the respect to the performance of medical services not warranted" (*id.* at ¶ 1010);

- "The [D]efendants' *mis*representations included, but are not limited to, the following: (a) preparing and submitting *false* insurance claims; (b) participating in and/or causing the preparation and submission of *fraudulent* medical records, treatment notes and medical invoices regarding treatment that was not warranted; and (c) *falsely* documenting the existence, nature and/or extent of injury" (*id.* at ¶ 1011);

- "The foregoing *fraudulent* representations were *false*, or at least

required the disclosure of additional facts to render the information furnished by the [D]efendants *not misleading*" (*id.* at ¶ 1012);

¶ "The [D]efendants' *fraudulent* medical billing practices as alleged throughout this Complaint constitute *unfair and deceptive* trade practices in violation of CUTPA" (*id.* at ¶ 1016);

¶ "The [D]efendants submitted hundreds of *false* written statements and invoices relating to services allegedly provided to patients with the intent to cause Allstate to pay them money, directly or indirectly" (*id.* at ¶ 1022).

The Amended Complaint also describes each exemplar claim in the following ways:

¶ 78 of the exemplar claims as involving "treatment and testing" that "was not justified" or "was not supported" "by the records submitted to Allstate," which Allstate describes as reflecting "False Medical Documentation" and "Treatment Not Rendered" (Am. Compl. *passim*[4]);

---

[4] *See* Claim Nos. 6362152487 (Am. Compl. at ¶ 68); 6362203355 (*id.* at ¶ 82); 6362627843 (*id.* at ¶ 94); 6362480318 (*id.* at ¶ 108); 6362138502 (*id.* at ¶ 117); 2155777184 (*id.* at ¶ 130); 3963096328 (*id.* at ¶ 144); 2154679902 (*id.* at ¶ 157); 2154679902 (*id.* at ¶ 169); 6362398311 (*id.* at ¶ 182); 2155506294 (*id.* at ¶ 193); 2155442771 (*id.* at ¶ 207); 2155442771 (*id.* at ¶ 219); 3963410462 (*id.* at ¶ 228); 2155511013 (*id.* at ¶ 241); 6362400738 (*id.* at ¶ 252); 6362406180 (*id.* at ¶ 261); 6362318179 (*id.* at ¶ 273); 6362199768 (*id.* at ¶ 282); 6362487495 (*id.* at ¶ 297); 6362486927 (*id.* at ¶ 311); 6362176775 (*id.* at ¶ 325); 6362173848 (*id.* at ¶ 337); 6362664796 (*id.* at ¶ 351); 6362618842 (*id.* at ¶ 365); 2155316579 (*id.* at ¶ 378); 3964467701 (*id.* at ¶ 388); 2155388693 (*id.* at ¶ 399); 3964602042 (*id.* at ¶ 408); 6393801249 (*id.* at ¶ 416); 2155453299 (*id.* at ¶ 428); 3963612356 (*id.* at ¶ 440); 3963612356 (*id.* at ¶ 449); 3963222180 (*id.* at ¶ 461); 3963684637 (*id.* at ¶ 471); 3693566461 (*id.* at ¶ 483); 3963566461 (*id.* at ¶ 498); 3964377595 (*id.* at ¶ 509); 2155210400 (*id.* at ¶ 516); 2155616358 (*id.* at ¶ 528); 3963774354 (*id.* at ¶ 540); 3963774354 (*id.* at ¶ 552); 2155586833 (*id.* at ¶ 564); 2155586833 (*id.* at ¶ 576); 6362168913 (*id.* at ¶ 592); 3962192806 (*id.* at ¶ 604); 3963803195 (*id.* at ¶ 616); 3963268381 (*id.* at ¶ 629); 3964019759 (*id.* at ¶ 642); 2155469121 (*id.* at ¶ 651); 6362662402 (*id.* at ¶ 663); 2155508753 (*id.* at ¶ 675); 2155508753 (*id.* at ¶ 687); 3963239993 (*id.* at ¶ 699); 3963239993 (*id.* at ¶ 710); 6362163393 (*id.* at ¶ 720); 6362163393 (*id.* at ¶ 732); 6362361970 (*id.* at ¶ 743); 6362560234 (*id.* at ¶ 756);

¶ 58 of the exemplar claims as including patients who "received false diagnostic testing" on various dates even though "[D]efendants represented to Allstate that such diagnostic testing was warranted," which Allstate describes as reflecting "Deleterious Treatment/Worthless Services," "Profit Maximization" and "False Medical Documentation" (*id. passim*[5]);

---

2155325797 (*id.* at ¶ 768); 3962952399 (*id.* at ¶ 780); 6362204171 (*id.* at ¶ 792); 6362204171 (*id.* at ¶ 804); 6362204171 (*id.* at ¶ 816); 6362602549 (*id.* at ¶ 825); 2155723147 (*id.* at ¶ 835); 3964669637 (*id.* at ¶ 844); 3964492394 (*id.* at ¶ 854); 3964121183 (*id.* at ¶ 866); 1705266524 (*id.* at ¶ 878); 396399028 (*id.* at ¶ 885); 3965352950 (*id.* at ¶ 895); 3964677416 (*id.* at ¶ 903); 2155686393 (*id.* at ¶ 911); 3964639036 (*id.* at ¶ 919); 3634736833 (*id.* at ¶ 929); 3634739878 (*id.* at ¶ 938); 3964129145 (*id.* at ¶ 946).

[5] *See* Claim Nos. 6362152487 (Am. Compl. at ¶¶ 70–71); 16362203355 (*id.* at ¶¶ 84–85); 26362627843 (*id.* at ¶¶ 96–97); 36362138502 (*id.* at ¶¶ 118–119); 42155777184 (*id.* at ¶¶ 132–133); 53963096328 (*id.* at ¶¶ 145–146); 62154679902 (*id.* at ¶¶ 159–160); 72154679902 (*id.* at ¶¶ 170–171); 86362398311 (*id.* at ¶¶ 183–184); 92155506294 (*id.* at ¶¶ 195–196); 102155442771 (*id.* at ¶¶ 209–210); 112155442771 (*id.* at ¶¶ 220–221); 123963410462 (*id.* at ¶¶ 229–230); 132155511013 (*id.* at ¶¶ 242–243); 146362406180 (*id.* at ¶¶ 265–266); 156362199768 (*id.* at ¶¶ 287–288); 166362487495 (*id.* at ¶¶ 301–302); 176362486927 (*id.* at ¶¶ 315–316); 186362176775 (*id.* at ¶¶ 329–330); 196362173848 (*id.* at ¶¶ 341–342); 206362664796 (*id.* at ¶¶ 356–357); 216362618842 (*id.* at ¶¶ 368–369); 222155316579 (*id.* at ¶¶ 380–381); 233964467701 (*id.* at ¶¶ 389–390); 242155388693 (*id.* at ¶¶ 400–401); 256393801249 (*id.* at ¶¶ 418–419); 262155453299 (*id.* at ¶¶ 430–431); 273963612356 (*id.* at ¶¶ 441–442); 283963612356 (*id.* at ¶¶ 451–452); 293693566461 (*id.* at ¶¶ 486–487); 303963566461 (*id.* at ¶¶ 501–502); 312155210400 (*id.* at ¶¶ 518–519); 322155616358 (*id.* at ¶¶ 530–531); 333963774354 (*id.* at ¶¶ 542–543); 343963774354 (*id.* at ¶¶ 554–555); 352155586833 (*id.* at ¶¶ 566–567); 362155586833 (*id.* at ¶¶ 578–579); 373962192806 (*id.* at ¶¶ 608–609); 383963803195 (*id.* at ¶¶ 619–620); 393963268381 (*id.* at ¶¶ 632–633); 402155469121 (*id.* at ¶¶ 653–654); 416362662402 (*id.* at ¶¶ 665–666); 422155508753 (*id.* at ¶¶ 677–678); 432155508753 (*id.* at ¶¶ 689–690); 443963239993 (*id.* at ¶¶ 701–702); 456362163393 (*id.* at ¶¶ 722–723); 466362163393 (*id.* at ¶¶ 735–736); 476362361970 (*id.* at ¶¶ 746–747); 486362560234 (*id.* at ¶¶ 758–759); 492155325797 (*id.* at ¶¶ 770–771); 503962952399 (*id.* at ¶¶ 782–783); 516362204171 (*id.* at ¶¶ 794–795); 526362204171 (*id.* at ¶¶ 806–807); 536362204171 (*id.* at ¶¶ 817–818); 546362602549 (*id.* at ¶¶ 827–828); 552155723147 (*id.* at ¶¶ 836–837); 563964492394 (*id.* at ¶¶ 857–858); 573964121183 (*id.* at ¶¶ 869–870).

¶    55 of the exemplar claims as having "contained false permanent impairment ratings" (or, in one case, "improperly derived permanent impairment ratings" (*id.* ¶ 538)), which rendered the "medical records . . . false and/or fraudulent," and which Allstate describes as reflecting "False Medical Documentation" (*id. passim*[6]);

¶    40 of the exemplar claims as including "notes created by [D]efendants" regarding their submission of patient treatment records (so-called "SOAP notes" (*see* Pls.' Opp'n at 4)), which "contained insufficient detail" (Am. Compl. *passim*[7]), and another 6

---

[6] *See* Claim Nos. 6362152487 (Am. Compl. at ¶¶ 64–65); 6362203355 (*id.* at ¶¶ 78–79); 6362627843 (*id.* at ¶¶ 92–93); 6362480318 (*id.* at ¶¶ 104–105); 2155777184 (*id.* at ¶¶ 126–127); 3963096328 (*id.* at ¶¶ 140–141); 2154679902 (*id.* at ¶¶ 153–154); 6362398311 (*id.* at ¶¶ 178–179); 2155506294 (*id.* at ¶¶ 191–192); 2155442771 (*id.* at ¶¶ 203–204); 2155442771 (*id.* at ¶¶ 217–218); 2155511013 (*id.* at ¶¶ 237–238); 6362486927 (*id.* at ¶¶ 309–310); 6362173848 (*id.* at ¶¶ 337–338); 6362664796 (*id.* at ¶¶ 349–350); 2155316579 (*id.* at ¶¶ 376–377); 3964467701 (*id.* at ¶¶ 388–389); 6393801249 (*id.* at ¶¶ 414–415); 2155453299 (*id.* at ¶¶ 426–427); 3963612356 (*id.* at ¶¶ 438–439); 3963222180 (*id.* at ¶¶ 459–460); 3963684637 (*id.* at ¶¶ 469–470); 3693566461 (*id.* at ¶¶ 479–480); 3963566461 (*id.* at ¶¶ 494–495); 2155616358 (*id.* at ¶¶ 526–527); 3963774354 (*id.* at ¶¶ 550–551); 2155586833 (*id.* at ¶¶ 562–563); 2155586833 (*id.* at ¶¶ 574–575); 3962192806 (*id.* at ¶¶ 600–601); 3963268381 (*id.* at ¶¶ 627–628); 3964019759 (*id.* at ¶¶ 640–641); 2155469121 (*id.* at ¶¶ 649–650); 6362662402 (*id.* at ¶¶ 661–662); 2155508753 (*id.* at ¶¶ 673–674); 2155508753 (*id.* at ¶¶ 685–686); 3963239993 (*id.* at ¶¶ 697–698); 6362163393 (*id.* at ¶¶ 718–719); 6362163393 (*id.* at ¶¶ 730–731); 6362560234 (*id.* at ¶¶ 754–755); 2155325797 (*id.* at ¶¶ 766–767); 3962952399 (*id.* at ¶¶ 778–779); 6362204171 (*id.* at ¶¶ 790–791); 6362204171 (*id.* at ¶¶ 802–803); 6362204171 (*id.* at ¶¶ 814–815); 3964492394 (*id.* at ¶¶ 852–853); 3964121183 (*id.* at ¶¶ 864–865); 1705266524 (*id.* at ¶¶ 876–877); 3965352950 (*id.* at ¶¶ 893–894); 3964677416 (*id.* at ¶¶ 901–902); 2155686393 (*id.* at ¶¶ 909–910); 3964639036 (*id.* at ¶¶ 917–918); 3634736833 (*id.* at ¶¶ 927–928); 3634739878 (*id.* at ¶¶ 936–937); 3964129145 (*id.* at ¶¶ 944–945); 3963774354 (*id.* at ¶¶ 538–539).

[7] *See* Claim Nos. 2154679902 (Am. Compl. at ¶ 158); 6362664796 (*id.* at ¶ 353); 3963222180 (*id.* at ¶ 462); 3963684637 (*id.* at ¶ 472); 3693566461 (*id.* at ¶ 484); 3963566461 (*id.* at ¶ 499); 2155586833 (*id.* at ¶ 577); 6362160175 (*id.* at ¶ 585); 6362168913 (*id.* at ¶ 593); 3962192806 (*id.* at ¶ 606); 3963803195 (*id.* at ¶ 617); 3963268381 (*id.* at ¶ 630); 3964019759 (*id.* at ¶ 643); 2155469121 (*id.* at ¶ 652);

of the exemplar claims as including "SOAP notes" which "possess no clinical value" (*id. passim*[8]), which Allstate describes as reflecting "False Medical Documentation" and/or "Treatment Not Rendered" (*id. passim*[9]);

¶    33 of the exemplar claims as involving Defendants' "engage[ment] in the misleading interchange between" types of "services in connection with the treatment" of each patient (with the types of services denoted by unexplained two-letter acronyms), which Allstate describes as reflecting "False Medical Documentation" (*id. passim*[10]);

¶    18 of the exemplar claims as demonstrating that "[D]efendants

---

6362662402 (*id.* at ¶ 664); 2155508753 (*id.* at ¶ 676); 2155508753 (*id.* at ¶ 688); 3963239993 (*id.* at ¶ 700); 3963239993 (*id.* at ¶ 712); 6362163393 (*id.* at ¶ 721); 6362163393 (*id.* at ¶ 734); 6362361970 (*id.* at ¶ 744); 6362560234 (*id.* at ¶ 757); 2155325797 (*id.* at ¶ 769); 3962952399 (*id.* at ¶ 781); 6362204171 (*id.* at ¶ 793); 6362204171 (*id.* at ¶ 805); 6362602549 (*id.* at ¶ 826); 3964669637 (*id.* at ¶ 846); 3964492394 (*id.* at ¶ 855); 3964121183 (*id.* at ¶ 867); 1705266524 (*id.* at ¶ 879); 396399028 (*id.* at ¶ 886); 3965352950 (*id.* at ¶ 896); 3964677416 (*id.* at ¶ 904); 2155686393 (*id.* at ¶ 912); 3964639036 (*id.* at ¶ 920); 3634736833 (*id.* at ¶ 930); 3634739878 (*id.* at ¶ 939); 3964129145 (*id.* at ¶ 948).

[8] *See* Claim Nos. 6362406180 (Am. Compl. at ¶ 263); 6362318179 (*id.* at ¶ 275); 6362199768 (*id.* at ¶ 284); 6362487495 (*id.* at ¶ 298); 6362486927 (*id.* at ¶ 312); 6362176775 (*id.* at ¶ 327).

[9] *Supra* notes 7 & 8.

[10] *See* Claim Nos. 6362406180 (Am. Compl. at ¶ 264); 6362318179 (*id.* at ¶ 276); 6362199768 (*id.* at ¶ 286); 6362487495 (*id.* at ¶ 300); 6362486927 (*id.* at ¶ 314); 6362176775 (*id.* at ¶ 328); 6362173848 (*id.* at ¶ 340); 6362664796 (*id.* at ¶ 354); 6362618842 (*id.* at ¶ 367); 2155316579 (*id.* at ¶ 379); 6393801249 (*id.* at ¶ 417); 2155453299 (*id.* at ¶ 429); 3963612356 (*id.* at ¶ 450); 3963222180 (*id.* at ¶ 463); 3963684637 (*id.* at ¶ 473); 3693566461 (*id.* at ¶ 485); 3963566461 (*id.* at ¶ 500); 2155210400 (*id.* at ¶ 517); 2155616358 (*id.* at ¶ 529); 3963774354 (*id.* at ¶ 541); 3963774354 (*id.* at ¶ 553); 2155586833 (*id.* at ¶ 565); 6362160175 (*id.* at ¶ 586); 6362168913 (*id.* at ¶ 594); 3962192806 (*id.* at ¶ 607); 3963803195 (*id.* at ¶ 618); 3963268381 (*id.* at ¶ 631); 6362361970 (*id.* at ¶ 745); 3964492394 (*id.* at ¶ 856); 3964121183 (*id.* at ¶ 868); 1705266524 (*id.* at ¶ 880); 396399028 (*id.* at ¶ 887); 3964639036 (*id.* at ¶ 921).

engaged in fraudulent patient testing" and having "initiated patient treatment . . . before test results were obtained/analyzed," which Allstate describes as reflecting "Deleterious Treatment/Worthless Services" and "Profit Maximization" (*id. passim*[11]);

¶ 7 of the exemplar claims as "fail[ing] to document the personnel involved in the treatment of" the patient, which Allstate describes as reflecting "False Medical Documentation" (*id. passim*[12]);

¶ 4 of the exemplar claims in which "[D]efendants generated at least one unsubstantiated diagnosis," which Allstate describes as reflecting "False Medical Documentation" and "Treatment Not Rendered" (*id.* at ¶¶ 131 (Claim No. 2155777184), 208 (Claim No. 2155442771), 355 (Claim No. 6362664796) & 931 (Claim No. 3634736833));

¶ 3 of the exemplar claims as reflecting that "[D]efendants generated conflicting treatment plans" (*id.* at ¶¶ 338 (Claim No. 6362173848), 845 (Claim No. 3964669637) & 922 (Claim No. 3964639036)) and another claim involving "inconsistent treatment plans" (*id.* at ¶ 711 (Claim No. 3963239993)), which Allstate describes as reflecting "False Medical Documentation," "Deleterious Treatment/Worthless Services," and/or "Profit Maximization" (*id.* at ¶¶ 338, 711, 845 & 922).

¶ 3 exemplar claims as containing "inconsistent examination findings," which Allstate describes as reflecting "False Medical Documentation" (*id.* at ¶¶ 299 (Claim No. 6362487495), 313 (Claim No. 6362486927) & 947 (Claim No. 3964129145));

---

[11] *See* Claim Nos. 6362152487 (Am. Compl. at ¶¶ 66–67); 6362203355 (*id.* at ¶¶ 80–81); 6362480318 (*id.* at ¶¶ 106–107); 6362138502 (*id.* at ¶¶ 115–116); 2155777184 (*id.* at ¶¶ 128–129); 3963096328 (*id.* at ¶¶ 142–143); 2154679902 (*id.* at ¶¶ 155–156); 2154679902 (*id.* at ¶¶ 167–168); 6362398311 (*id.* at ¶¶ 180–181); 2155442771 (*id.* at ¶¶ 205–206); 2155511013 (*id.* at ¶¶ 239–240); 6362400738 (*id.* at ¶¶ 250–251); 6362487495 (*id.* at ¶¶ 295–296); 6362176775 (*id.* at ¶¶ 323–324); 2155388693 (*id.* at ¶¶ 397–398); 3693566461 (*id.* at ¶¶ 481–482); 3963566461 (*id.* at ¶¶ 496–497); 3962192806 (*id.* at ¶¶ 602–603).

[12] *See* Claim Nos. 6362152487 (Am. Compl. at ¶ 69); 6362400738 (*id.* at ¶ 253); 6362406180 (*id.* at ¶ 262); 6362318179 (*id.* at ¶ 274); 6362199768 (*id.* at ¶ 283); 6362176775 (*id.* at ¶ 326); 3962192806 (*id.* at ¶ 605).

¶    2 of the exemplar claims as including "contradictory bilateral examination findings" (*id.* at ¶¶ 352 (Claim No. 6362664796) & 366 (Claim No. 6362618842)), and another one exemplar claim as including "false/fraudulent bilateral examination findings" (*id.* at ¶ 83 (Claim No. 6362203355)), which Allstate describes as reflecting "False Medical Documentation" (*id.* at ¶¶ 83, 352 & 366).

¶    and one exemplar claim for each of the following issues:

(1)    "administrat[ion of] excessive treatment" to "a minor child," which Allstate describes as reflecting "Deleterious Treatment/Worthless Services" and "Profit Maximization" (*id.* at ¶ 709 (Claim No. 3963239993));

(2)    rendering treatment deemed "excessive" in light of "the patient's age," which Allstate describes as reflecting "Deleterious Treatment/Worthless Services" and "Profit Maximization" (*id.* at ¶ 733 (Claim No. 6362163393));

(3)    "generat[ing] at least one misleading diagnosis," which Allstate describes as reflecting "False Medical Documentation" (*id.* at ¶ 95 (Claim No. 6362627843));

(4)    "contain[ing] contradictory examination and diagnostic testing findings," which Allstate describes as reflecting "False Medical Documentation" (*id.* at ¶ 109 (Claim No. 6362480318));

(5)    rendering treatment that "was contraindicated by the patient's pregnancy," which Allstate describes as reflecting "Deleterious Treatment/Worthless Services" (*id.* at ¶ 339 (Claim No. 6362173848));

(6)    a claim in which "[D]efendants fraudulently misrepresented the nature of treatment allegedly rendered" and the bill for which "failed to reference the administration of chiropractic treatment," which Allstate describes as reflecting "False Medical Documentation" (*id.* at ¶¶ 254–55 (Claim No. 6362400738));

(7)    a claim for which "[t]he examination allegedly performed" on the patient "by [D]efendants was insufficient to address the

patient's chief complaints," which Allstate describes as reflecting "Deleterious Treatment/Worthless Services" and "Profit Maximization" (*id.* at ¶ 285 (Claim No. 6362199768)); and

(8)     a claim for which "[D]efendants filed template reports in support of the treatment" they rendered, which Allstate describes as reflecting "False Medical Documentation" (*id.* at ¶ 510 (Claim No. 3964377595)).

In addition, Plaintiffs attach to the Amended Complaint a chart, entitled "Unnecessary Treatment Chart," that organizes some of the claim numbers by "Injury," "CPT CODE," "DESCRIPTION," "DATE of Service," "No. of Units," and "AMOUNT." (*See* Am. Compl. Ex. 3.) (Plaintiffs also attach to the Amended Complaint five other charts which do not contain any allegations of fact regarding the contents of the Defendants' submissions to Plaintiffs not contained in the complaint itself.[13])

The Amended Complaint contains a recitation of facts regarding, for example, the relationship among the defendants (*see* Am. Compl. ¶¶ 1 & 22–32), Current Procedural Terminology Codes (*see id.* at ¶¶ 41–44), the fact of Allstate's payment of insurance proceeds

---

[13] Specifically, in addition to the Unnecessary Treatment Chart, Plaintiffs attach (1) an Evidence Allegation Chart which organizes the eight forms of deficiency alleged (*see* Am. Compl. ¶ 33) by the exemplar claims to which each applies (*see* Am. Compl. at Ex. 1); (2) a Pattern Chart which lists some of the exemplar claims by Claim No., each Claimant's first and last initial, and the Date of Loss (*see id.* at Ex. 2); (3) a Mail Fraud Chart, which lists the Claim Number, Claimant Name, "Date," Sender, Recipient, generic description of the contents, and Date Received of some of the exemplar claims (*see id.* at Ex. 4; (4) a First-Party Damages Chart, which lists some of the exemplar claims by Claim No., Date of Loss, insured's initials, Date of Check, Check No., and amount of Check (*see id.* at Ex. 5); and (5) a Third-Party Damages Chart, which lists some of the exemplar claims by Claim No., the claimants' first and last initials, Date of Loss, and Amount (*see id.* at Ex. 6).

(*see id. passim*[14]), and the manner in which Defendants submitted the exemplar claims to Allstate (*id.* at ¶¶ 951–56).

Together, Plaintiffs describe as "exhaustive factual notice concerning the fraudulent claims and defendants' involvement therewith" the combination of those allegations corresponding to each exemplar claim, plus those allegations generally pleaded. (Pls.' Opp'n at 26.)

### C.      *Pleading Fraud with Particularity*

Despite its length, the Amended Complaint fatally suffers from a dearth of actual facts in its allegations of fraud sufficient to satisfy Rule 9(b).

The Unnecessary Treatment Chart contains the most specific information regarding the Defendants' statements and conduct in rendering treatment to the exemplar claim patients and seeking payment from Allstate therefore. This Chart, however, gives no factual explanation of "why the statements were fraudulent." *Lerner*, 459 F.3d at 290. While the Chart lists in 425 entries the "injur[ies]" of each exemplar claim patient and "DESCRIPTION[S]"—presumably of the treatment Defendants rendered—for each exemplar claim, it does not explain what is problematic about the treatment supporting an inference

---

[14] The last paragraph of each of the 79 exemplar claim's set of allegations states that "Allstate paid insurance proceeds" "[i]n reliance on the foregoing medical documentation forwarded by [D]efendants." (*See* Am. Compl. ¶¶ 74, 88, 100, 111, 122, 136, 149, 163, 174, 187, 199, 213, 224, 233, 246, 257, 269, 278, 291, 305, 319, 333, 345, 360, 372, 384, 393, 404, 410, 422, 434, 445, 455, 465, 475, 490, 505, 512, 522, 534, 546, 558, 570, 582, 588, 596, 612, 623, 636, 645, 657, 669, 681, 693, 705, 714, 726, 739, 750, 762, 774, 786, 798, 810, 821, 831, 840, 848, 860, 872, 881, 889, 897, 905, 913, 923, 932, 940, 949.)

of fraud, or why the descriptions and acronyms utilized implicate fraudulent conduct.[15]

Therefore, even construed with all inferences in the Plaintiffs' favor, the chart, which lists

the treatment(s) Defendants provided for each patient and labels each treatment as

"unnecessary," does not explain why the treatment was unnecessary, why seeking payment

for unnecessary (or worthless) treatment actually rendered is fraudulent, or why Defendants'

submission of bills listing such treatment[16] constitutes fraud, as distinguished from

challenges to choice and proficiency of medical treatment rendered, manifested by the

records themselves.[17]

    With the exception of the Unnecessary Treatment Chart a designation of which

individual defendants created the documents submitted to Allstate for each exemplar

---

[15] The Unnecessary Treatment Chart uses, *inter alia*, the following descriptions: "ROM Cervical," "ROM Lumbar," "ROM Shoulder," "Comprehensive Muscle Test," "Spirometry," "Ultrasound Neck," "Motor Nerve Conduction," "T&M," and "CPT" (in addition to "CPT Code"). Although these terms and acronyms may be commonly used among health care professionals, the complaint and the charts attached thereto offer no meaning connoting fraud or fraudulent intent.

[16] Plaintiffs do not allege that the exemplar claims Defendants submitted to Allstate omitted mention of the treatments Allstate has alleged Defendants to have rendered.

[17] In addition, despite being the only document attached to the Amended Complaint listing "CPT Codes" for any of the exemplar claims, the Unnecessary Treatment Chart does not list any of the CPT Codes noted in the complaint's allegations of "impermissible" bundling. (*Compare* Am. Compl. ¶¶ 42–43 (listing CPT Codes 9586X, 97140, 97530 and 98940–43) *with id.* Ex. 3 Column 6 ("CPT CODE")).

claim,[18] none of Plaintiffs' allegations regarding the content of Defendants' exemplar claims constitute "facts."  They are conclusions—some of them legal conclusions—that each exemplar claim is problematic, but none of the "facts" contained in the exemplar claims support their conclusions of the existence of fraud.  Therefore, while the Amended Complaint alleges that "[t]he chart annexed [to the complaint] as Exhibit 1 . . . outlines [D]efendants' claim-specific fraudulent conduct, and details the specific nature of the misrepresentation(s) and/or other fraudulent content advanced by or on behalf of [D]efendants with respect to each claim plead [*sic*]" (Am. Compl. ¶ 35), it does not do either of these things.  Neither the Evidence Allegation Chart nor the complaint quotes or describes in non-conclusory fashion any "content" of any of the claims.

For example, Plaintiffs allege that the "false diagnostic testing" they associate with many of the exemplar claims "was nothing more than a worthless service" that "was provided to (a) maximize [D]efendants' profit[] and/or (b) inflate medical bills to allow claimants to artificially inflate their third-party tort claims with Allstate."  (Am. Compl. ¶¶ 39–40.)  No specific facts about the tests or test practices themselves are alleged, nor are

---

[18] For each exemplar claim, Plaintiffs list one or more of the individual defendants "in addition to Goldring" as being "responsible for the creation of the false medical documentation submitted for payment to Allstate in connection with the alleged treatment of" that claim's patient.  (*See* Am. Compl. ¶¶  63, 77, 91, 103, 114, 125, 139, 152, 166, 177, 190, 202, 216, 227, 236, 249, 260, 272, 281, 294, 308, 322, 336, 348, 363, 375, 387, 396, 407, 413, 425, 437, 448, 458, 468, 478, 493, 508, 515, 525, 537, 549, 561, 573, 585, 591, 599, 615, 626, 639, 648, 660, 672, 684, 696, 708, 717, 729, 742, 753, 765, 777, 789, 801, 813, 824, 834, 843, 851, 863, 875, 884, 892, 900, 908, 916, 926, 935, 943.)

any facts that would support any inference that such testing was either a "worthless service" (a term Plaintiffs do not define) or done merely to increase the bills submitted to Allstate. The Amended Complaint lists what diagnostic tests were performed for only some of the exemplar claims,[19] and it does not factually explain the "falsity" claimed or even provide facts sufficient to infer if or how Defendants justified performing those tests; what aspect of the patient record or exemplar claim shows that the test was "worthless" or done for no good medical reason; or why bills for "worthless service[s]" which state what services were rendered are "fraudulent."

Plaintiffs also allege no facts regarding general medical treatment principles, or Defendants' practice in particular. Plaintiffs do not allege, for example, that Defendants requested payment for services claimed to have been rendered that they were not licensed or authorized to perform, or that Defendants do not have medical equipment on which they claim to have performed the services for which they billed Allstate, which might have supported an inference that the exemplar claims sought payment for treatment not rendered. As to the patients whose treatment gave rise to the exemplar claims, Plaintiffs do not make any allegations supporting an inference that Plaintiffs were billed for treatment that the patients never received. In fact, Plaintiffs expressly clarified at oral argument that they were not claiming that Defendants' bills included charges for treatment or services that were, in

---

[19] Such treatments are listed in the Unnecessary Treatment Chart. (*See* Am. Compl. Ex. 3.)

fact, not actually rendered. (Transcript of Oral Argument [Doc. # 91] ("Oral Arg. Tr.") at 41:4–25.[20])) Plaintiffs allege no specific facts regarding treatment, tests, diagnoses, equipment, or any product or service that Defendants rendered beyond abbreviated descriptions of what treatments Defendants billed for. There are no allegations that Defendants did not perform particular tests, or did not make a particular diagnosis, or did not render any particular service or treatment, or did not prescribe any particular medication or medical equipment as represented on documents they submitted to Allstate. Plaintiffs' allegations make no distinction between what Defendants say they did in their billing documentation, and what Plaintiffs claim they actually did.

Because a fraud is "[a] knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment," BLACK'S LAW DICTIONARY 685 (8th ed. 2004),[21] a conclusion that a representation is fraudulent requires both that the representation be false—which in turn requires the existence of a fact with which the

---

[20] In response to the Court's two questions seeking to clarify if "it is correct that Allstate is not claiming that the services billed for were not rendered," Plaintiffs' counsel explained that Plaintiffs' claim was that the worthlessness of the services performed by Defendants rendered made those services "akin to being not rendered." (Oral Arg. Tr. at 41:4–25; *see also* Pls.' Opp'n at 3 (arguing that "treatment allegedly rendered to Allstate claimants . . . constituted nothing more than deleterious treatment, worthless services and/or treatment rendered solely to maximize profit," which "for all legal purposes[ ]represented treatment not rendered").)

[21] *See also* WEBSTER'S II DICTIONARY 286 (3d ed. 2005) (defining "fraud" as "[a] deliberate deception perpetrated for unlawful or unfair gain")

representation is inconsistent[22]—and the intent that such representation, known by the speaker to be false, to be taken as true by the person to whom the representation is made. Here, Plaintiffs allege very few representations by Defendants, and, importantly, no facts with which those representations are inconsistent. The complaint contains no actual facts which, if proven true, could lead either to the conclusion that Defendants' representations—that is, the statements Defendants submitted to Allstate—were untrue, or that Defendants intended those who read the documents to misapprehend the information they contained.

Plaintiffs instead assert simply that the claims Defendants submitted were "false," "fraudulent," "inflated," "excessive," "worthless," "misrepresentat[ive]," "improper," "deceptive," "exaggerated," "fabricated," "self-concealing," "wholly fictitious," "misleading," and "grossly inflated," or were for treatments that were "not reasonable," "not necessary," and "of no therapeutic value." In short, they argue that Defendants' insurance claims constitute "fraud" because they constitute "fraud," with no underlying facts on which such a conclusion could be based. An *allegation* that an invoice was "fraudulent" cannot form the basis of a *conclusion* that the invoice was "fraudulent," just as an *allegation* that a diagnostic test was "false" cannot form the basis of a *conclusion* that the test was "false." These allegations are "conclusory" because they "express[] a factual inference without stating the

_____

[22] *Cf.* Oxford English Dictionary (2d ed. 1989) (defining "false" as being "[c]ontrary to what is true")

25

underlying facts on which the inference is based." *See* Black's Law Dictionary 308 (8th ed. 2004) (defining "conclusory"); *cf.* Oxford English Dictionary (2d ed. 1989) (defining "tautology" as a term "[a]pplied to the repetition of a statement as its own reason"). In other words, Allstate's allegations are conclusory because they do not allege any facts supporting an inference contrary to that which Defendants' statements represent.

Indeed, Plaintiffs do not allege any facts regarding Defendants' treatment of any patient that are derived from any source of information other than Defendants' own submissions. Thus, their allegation that "[t]he foregoing fraudulent representations were false, or at least required the disclosure of additional facts to render the information furnished by the [D]efendants not misleading" (Am. Compl. at ¶ 1012), lays bare the problem with their complaint: not only is Allstate's allegation that Defendants' "fraudulent representations were false" tautological on its face, but without facts external to Defendants' submissions to Allstate, Allstate offers no reason how or why it was misled at the time bills were submitted for payment and what later came to light which led it to conclude that such submissions were fraudulent. Indeed, even if Defendants' invoices contained charges for treatment not covered under Defendants' agreement with Allstate—which Allstate does not allege—such ineligible charges do not necessarily constitute fraud.

Taken from a different angle, the fundamental failure of the Amended Complaint stems from the fact that any fraudulence Allstate claims to have discovered is based on its review of the very records that Defendants themselves submitted to Allstate. As to each

exemplar claim Allstate does not allege any facts not contained in the exemplar claims themselves or medical documentation Defendants submitted to Allstate. Allstate does not even allege the existence of facts not contained in the exemplar claims which led it to realize that the representations Defendants made in the exemplar claims were untrue or misleading—much less what such facts are. Plaintiffs do not allege any external facts or benchmarks by which to judge the accuracy, fraudulence, misleading nature, or truthfulness of Defendants' submissions to Allstate. Instead, it alleges only a "pattern of fraudulent conduct" that Allstate "did not discover . . . until 2007" (Am. Compl. ¶¶ 971 & 973) without explaining what that pattern is. In fact, there is no specificity in any of Plaintiffs' conclusory allegations that the form of Defendants' submissions to Allstate concealed the true nature of the treatments Defendants rendered in such a way as to make those submissions false.

Allstate also argues that the Amended Complaint supports allegations that "[D]efendants engaged in the misleading interchange between medical and chiropractor treatments and submitted medical bills under the name and tax identification number of a licensed physician despite the fact that the treatment was rendered by a non-physician" (*id.* at 4 (citing Am. Compl. *passim*)), which "leads to the inevitable conclusion that such misrepresentations were made by [D]efendants to intentionally conceal the existence of their medical billing fraud scheme and to evade the review and scrutiny of payors, including Allstate" (*id.*). However, the allegations Allstate cites for this proposition do not stand for the specific factual assertion it makes in its Memorandum in Opposition to the Defendants'

Motion to Dismiss. The Amended Complaint contains no "tax identification number[s]" nor any allegations about any such numbers. The allegations in the Amended Complaint to which Allstate cites allege in one case that "[t]he bills submitted by [D]efendants in support of the treatment allegedly rendered" to a patient "failed to reference the administration of chiropractic treatment" (*id.* at ¶ 255); in more cases that "[t]he [D]efendants failed to document the personnel involved in the treatment of" each exemplar claim patient (*See* Am. Compl. at ¶¶ 69, 253, 274, 283, 326, 605); and in a large number of cases that "[t]he [D]efendants engaged in the misleading interchange between" types of "services in connection with the treatment of" each patient (*id.* at ¶¶ 264, 276, 286, 300, 314, 328, 340, 354, 367, 379, 417, 429, 450, 463, 473, 485, 500, 517, 529, 541, 553, 565, 586, 594, 607, 618, 631, 745, 856, 868, 880, 887). The last of these allegations is conclusory because the complaint alleges no facts underpinning Allstate's conclusion that the bills submitted were misleading. The second of these allegations does not explain the fraudulence, or provide facts sufficient to infer the fraudulence, that inheres when a bill submitted for payment fails to document which people were involved in each patient's treatment. And not only does the exemplar claim for which the first allegation is made (Claim No. 6362400738) not appear in either of the two charts Plaintiffs reference in their memorandum (*see* Exs. 1 & 2), but there is no allegation that the treatment associated with that exemplar claim even involved chiropractic treatment such that the claim's failure to reference it is problematic, false or fraudulent. On this basis these allegations do not support an inference of fraud or

fraudulence.

In light of the Amended Complaint's failure to allege any facts necessary to conclude that Defendants' submissions to Allstate were false or fraudulent, Allstate's Amended Complaint fails to "explain why the statements were fraudulent," as Rule 9(b) requires. Instead, Plaintiffs' allegations, being the archetype of conclusory tautologies, are insufficient under Rule 9(b) and on this basis Defendants' Motion to Dismiss will be granted.

### D.   *Rule 9(b)—Allegations of Fraudulent Intent*

For many of the same reasons as its allegations of fraudulent statements are insufficient, the Amended Complaint's allegations of Defendants' fraudulent intent are insufficient. Allstate does not address the sufficiency of its allegations of Defendants' fraudulent intent in its opposition to the Defendants' Motion to Dismiss. Allstate alleges that "[a]ll of the acts and omissions of the [D]efendants" alleged in the complaint "were undertaken intentionally" (Am. Compl. at ¶ 3), but does not allege any facts on which to infer Defendants' fraudulent intent. A plaintiff may satisfy Rule 9(b)'s requirement to "allege[] generally" "conditions of a person's mind" such as "intent" either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner*, 459 F.3d at 290–91. Here, Allstate has not alleged either the kind of facts or factual allegations "constitut[ing] strong circumstantial evidence of conscious misbehavior or recklessness." Apart from conclusory allegations that Defendants "engaged

in a scheme to defraud Allstate" (Am. Compl. at ¶ 1) and recitation of the boilerplate language on the form documents Defendants filled out and submitted with each exemplar claim (*id.* at ¶¶ 963–64), Plaintiffs make no allegations that could suggest conscious misbehavior or recklessness.[23]

As to opportunity and motive, Plaintiffs allege that "[D]efendants' ability to conceal the fraudulent scheme was enhanced by the position of trust medical providers are typically accorded in the transaction of medical insurance claims" (*id.* at ¶ 969), but no facts regarding Defendants' motive to defraud Allstate, nor any facts on which any inference of intent could be made other than that Defendants generally sought to enrich themselves by engaging in a "scheme [which] was designed to, and did, in fact, result in the payment of . . . proceeds from Allstate to the [D]efendants." (*Id.* at ¶ 4.) The inadequacy of these allegations can be seen from the context of securities fraud cases brought under 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), in which the Second Circuit has explained that "broad allegations"—including

---

[23] Allstate alleges that "[t]he [D]efendants misrepresented chiropractic manipulation (CPT Code 9586X) as manual therapy (CPT Code 97140) to intentionally engage in CPT Code unbundling, which allowed them to bill for services subsumed within CPT Code 98940-98943 (chiropractic manipulation)" (Am. Compl. at ¶ 42) and that "the [D]efendants billed chiropractic manipulation as manual therapy (CPT Code 97140) to bundle CPT Codes 97140 and 97530 (therapeutic activities), which is otherwise impermissible" (*id.* at ¶ 43). Apart from Allstate's characterization of these facts, none of these facts, alone or in combination with other allegations, are sufficient to raise any "strong inference of fraudulent intent," or are facts "constitut[ing] strong circumstantial evidence of conscious misbehavior or recklessness." In other words, there are no facts pleaded that elevate these facts from being incorrect entries to being intentionally misleading entries.

"'general allegations of economic self-interest' and allegations, pled on only information and belief but lacking particularized facts, that the individual [d]efendants[] simply wished to conceal prior illegal activity"—"are not sufficiently particularized to survive a motion to dismiss." *Bay Harbour Mgmt. LLC v. Carothers*, 282 F. App'x 71, 76–77 (2d Cir. 2008) (affirming district court, and citing *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) ("Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud.").)[24] A general interest in self-enrichment being insufficient to satisfy Rule 9(b)'s requirement that fraudulent intent be "alleged generally," Defendants' Motion to Dismiss Allstate's Amended Complaint must be granted on this ground as well.

### E. Comparison with a Complaint Held Sufficient Under Rule 9(b)

The conclusory nature of Plaintiffs' allegations becomes clearer when compared to the allegations of another insurance company's suit against medical providers for RICO and fraud, which were found sufficient under Rule 9(b). *See AIU Ins. Co. v. Olmecs Med. Supply,*

---

[24] These Rule 10b-5 cases are appropriate authority here because the requirements for pleading fraudulent intent in the Rule 10b-5 context are identical to those under Rule 9(b). *See Bay Harbour*, 282 F. App'x at 76 (quoting the same standard from *Lerner*, 459 F.3d at 290–91, as this Court quotes from *Lerner, supra*, to establish that "a securities fraud plaintiff's scienter allegations must 'give rise to a strong inference of fraudulent intent,' and that such a plaintiff may establish the requisite intent either '(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'").

*Inc.*, No. CV-04-2934 (ERK), 2005 WL 3710370, 2005 U.S. Dist. LEXIS 29666 (E.D.N.Y. Feb. 22, 2005) ("*Olmecs*").

In *Olmecs*, the court concluded that the complaint pleaded fraud with sufficient particularity for Rule 9(b) purposes because the plaintiff "provided a detailed chart" of each allegedly fraudulent event, "including for each event [which of the defendants] submitted the claim, the claim number, the [service] billed for, [and] the prices charged, the dates of the submissions." *Olmecs*, 2005 WL 3710370, *12, 2005 U.S. Dist. LEXIS 29666, *39. While the *Olmecs* plaintiffs did not "specify the fraud involved for each submission," they specified the fraud involved in allegations of particular conduct, and then linked those specific allegations to the exemplar claims to which they applied. As a result, that court held that "the specific fraud is evident" by reading the plaintiff's exemplar claims "in conjunction with the conduct described in the complaint." *Olmecs*, 2005 WL 3710370, *12, 2005 U.S. Dist. LEXIS 29666, *40.

The *Olmecs* complaint was structurally similar to Allstate's in that it made certain allegations common to each of the challenged documents submitted by the defendants for payment, and then, in chart form, alleged a series of exemplar claims each of which suffered from some or all of the problems alleged generally in the complaint itself. *See generally* Complaint at ¶¶ 5–51 & Ex. A, *Olmecs* (hereinafter "*Olmecs* Compl."). However, in alleging "conduct" and as well as fraudulent content in the exemplar claims, the *Olmecs* plaintiffs alleged specific and actual facts which, if true, would both demonstrate the fraudulence of

the defendants' statements and support an inference that the defendants acted with fraudulent intent. For example, the *Olmecs* plaintiffs alleged that under the New York regulation under which the defendants billed the plaintiffs, physicians were allowed to bill insurers for up to 150% of the arms-length-negotiated cost for equipment that was "medically necessary," so long as the "'full particulars of the nature and extent'" of the items billed for are included in the invoice. *Id.* at ¶¶ 5–7 & 18–23 (quoting 11 N.Y.C.R.R. §§ 65-1.1 & 65-3.8(f)). The *Olmecs* complaint alleged that not only did the defendants "know," when signing letters of medical necessity attesting to the equipment's necessity, both that they could bill only for medically necessary equipment and that the equipment for which it billed was not necessary. *Id.* at ¶¶ 12, 15, 17. It also alleged that the bills "do not reflect prices paid in legitimate transactions, if those prices were paid at all," *id.* at ¶ 17, because the arms-length-negotiated costs for some equipment were "approximately 2 to 20 times less than the prices at which the items are purportedly sold by the Wholesale Defendants to the Retail Defendants;" the complaint also alleged specific dollar amounts to substantiate the allegation that the prices the defendants billed were far higher than arms-length-negotiated prices. *Id.* at ¶ 22 (noting equipment prices of "$78-$80, $80 and $29-$45," billed to the plaintiff, for equipment "readily available from numerous legitimate sources in the New York City area and elsewhere" at "$11, $10 and $2, respectively"). To support allegations that the defendants fraudulently billed for cervical collars, the plaintiffs alleged that the defendants failed to include any information regarding the type of collar prescribed for each patient and

"purportedly fill every prescription for a basic cervical collar with a semi-rigid, thermoplastic foam, two-piece cervical collar" with maximum charge of $75 even though "a provider usually must know certain unique dimensions of the relevant area of each patient's body," indicating that defendants prescribed the collars "without regard for whether they would fit and benefit the Insureds." *Id.* at ¶¶ 28 & 32. The *Olmecs* plaintiffs were also specific as to the falsity and fraudulence of the exemplar claims. In the allegations about cervical collars, for example, the plaintiffs alleged:

> Even if the Retail Defendants actually provided the more sophisticated cervical collars (L0172) to Insureds, their charges are fraudulent because: (a) the basic cervical collars prescribed by the Prescribing Doctors were not medically necessary, (b) semi-rigid, thermoplastic foam, two-piece cervical collars were not prescribed by the Prescribing Doctors or any other doctors, and were not medically necessary, (c) $119 is more than ten times the amount the Retail Defendants were entitled to collect for the basic cervical collars that were prescribed, and (d) it is unlikely that any of the cervical collars were intended to benefit the Insureds (i.e. medically necessary) in that there is little, if any, indication in the defendants' documentation that they had the measurements for each Insured . . . necessary to select one of the appropriate height and circumference, or performed any of the necessary fittings or adjustments for each Insured.

*Id.* at ¶ 33. The *Olmecs* complaint made similarly specific allegations in support of claims that the defendants submitted fraudulent charges for lower back supports. *See id.* at ¶¶ 43–44. The *Olmecs* plaintiffs attached exemplar prescriptions and letters of medical necessity from each doctor, *see Olmecs* Compl. Exs. C & D, that showed how the letters of medical necessity were merely "boilerplate" letters which "do not mention any condition of the particular Insureds," but instead "provide a stock description of each item prescribed for

the Insured in question," *id.* at ¶ 46, contained signatures that did not match the signatures on the prescriptions despite purportedly being of the same signatory, *id.*, and specified what information the prescriptions should have contained, such as "the make, model, size, features or functions" of the equipment prescribed, which was missing, *id.* at ¶ 45. The complaint also alleges that these generic, boilerplate documents submitted by the defendants deprived the *Olmecs* plaintiffs the kind of information necessary to determine whether and how much to pay, and that the defendants omitted such information "to avoid the provision of the No-Fault Laws which requires providers of health care services . . . to provide the 'full particulars of the nature and extent' of the items for which they seek payment.'" *Id.* at ¶ 50. Finally, in the paragraph of the *Olmecs* Complaint most similar to the paragraph in Allstate's complaint providing a taxonomy or typology of the eight ways in which Defendants' statements are allegedly false (*see* Allstate Am. Compl. ¶ 33), the *Olmecs* complaint expanded to give specificity about the problems with the defendants' statements:

> [I]n each and every claim submitted to the [p]laintiffs, the defendants knowingly have made some or all of the following misrepresentations:
>
> (a)    made material misrepresentations that the durable medical equipment and orthotic devices prescribed by the Prescribing Doctors were medically necessary when, in fact, they were not;
>
> (b)    omitted basic, material facts regarding the kind and quality of the durable medical equipment and orthotic devices for which they have sought payment . . .
>
> (c)    made material misrepresentations that the costs that the Retail Defendants purportedly incurred in purchasing those items from the Wholesale Defendants were legitimate when,

in fact, those costs either (i) were [illegitimate]; or (ii) were not actually incurred;

(d)     made . . . material misrepresentations regarding cervical collars purportedly provided to Insureds [that suffer from the problems listed in the paragraph quoted above (*Olmecs* Compl. ¶ 33)];

(e)     made . . . material misrepresentations regarding [lumbar-sacral (lower back) supports] purportedly provided to Insureds [that suffer from the problems listed in the paragraph cited above (*Olmecs* Compl. ¶¶ 43–44)];

(f)     made the following material misrepresentations regarding [thoracolumbosacral orthosis with anterior, posterior and lateral control ("TLSO with APL")] purportedly provided to Insureds (i) that custom fitted TLSOs with APL (L0430) were medically necessary when, in fact, they were not; and (ii) that any TLSOs with APL which were provided were designed to benefit the Insureds when, in fact, the apparent lack of necessary measurements, fittings and adjustments in many instances indicates that they were not.

*Olmecs* Compl. ¶ 51. Juxtaposed with the *Olmecs* Complaint, Allstate's Amended Complaint fails to allege any specific and particular facts necessary to defeat a motion to dismiss under Rule 9(b).

## III.     Whether to Grant Leave to Amend

Although "[p]laintiffs whose complaints are dismissed pursuant to Rule 9(b) are typically given an opportunity to amend their complaint," *Olsen v. Pratt & Whitney Aircraft, a Div. of United Techs. Corp.*, 136 F.3d 273, 276 (2d Cir. 1998) (citing *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986)), "[i]n cases where such leave has not been granted, plaintiffs have usually already had one opportunity to plead fraud with greater specificity," *Luce*, 802 F.2d

at 56.

Here, not only were Plaintiffs already provided an "opportunity to plead fraud with greater specificity," this Court's procedures ensured that Plaintiffs were on notice, prior to filing their Amended Complaint, as to exactly the bases on which Defendants intended to move to dismiss the complaint, including, *inter alia*, insufficiency under Rule 9(b).  Prior to allowing Defendants to move to dismiss, this Court held a pre-filing conference, the purpose of which, as the Court explained to counsel, "is to give [Plaintiffs] an opportunity to amend your complaint to address the grounds of the forthcoming motion to dismiss as best you can."  (Pre-Filing Conf. Tr. at pp. 8–9.)  During this pre-filing conference Defendants clarified that they would move to dismiss either the original Complaint [Doc. # 1] or, if filed, the Amended Complaint that Plaintiffs had proposed (Proposed Am. Compl. [Doc. # 58-1]), including for insufficiency under Rule 9(b) as well as other reasons.[25]  In particular,

---

[25] The Proposed Amended Complaint is not materially different from the Amended Complaint, as filed.  At the pre-filing conference defense counsel stated of "[t]he proposed amended complaint" that "[w]e think that it's likewise deficient."  (Pre-Filing Conf. Tr. at p. 7.)  The Court can find no allegation regarding the content of the exemplar claims or the fraudulence of Defendants' statements to Allstate in the Amended Complaint, as filed, that is in any way more specific than the allegations in the original Complaint [Doc. # 1] or the Proposed Amended Complaint.  Attached to the original Complaint were six charts that included the same form of organization and information as those attached to the Amended Complaint [*see* Docs. ## 1-2 through 1-8].  And the Proposed Amended Complaint contained a lengthy series of allegations for each exemplar claim that contained the same substance as the Amended Complaint spread out over more (1,026) paragraphs.  (*Compare* Proposed Am. Compl. ¶¶ 56–1082 *with* Am. Compl. ¶¶ 61–949.)  While the Proposed Amended Complaint uses 16, rather than eight, different phrases to describe the forms of defect in each exemplar claim, such descriptions are equally unhelpful in inferring the fraudulence of Defendants'

Defendants stated their view that "[t]he proposed amended complaint contains the same kind of conclusory language which was set forth in the original complaint, it relies on the same kind of generic charge as the first complaint" (Pre-Filing Conf. Tr. at p. 7), stating that in their motion to dismiss they would address "the failure of the [P]laintiffs to plead misrepresentations of fact and the other earmarks of fraud that one would expect in a complaint of this type" (*id.* at p. 5) and would argue that statements included in medical bills "are not false when reasonable minds can disagree regarding whether the service was properly billed" (*id.* at p. 6). In light of Defendants' representations of the grounds on which they would base their forthcoming motion to dismiss, the Court warned Plaintiffs:

> If you don't want to change your proposed amended complaint, that's fine, just file it, but what it means is that the motion to dismiss is then directed to a final product, and having been put on notice of what the deficiencies are, you are not given leave to amend if the motion to dismiss is granted.

(Pre-Filing Conf. Tr. at p. 9.) Plaintiffs stated that such an arrangement "will be fine." (*Id.*)

As a result, the Court dismisses Plaintiffs' Amended Complaint without leave to amend.

---

submissions as those in the Amended Complaint. (*Compare* Proposed Am. Compl. ¶ 29 *with* Am. Compl. ¶ 33.)

## IV.    Conclusion

For the reasons set forth above, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint [Doc. # 67] is GRANTED.  Plaintiffs' Amended Complaint is dismissed without leave to amend.  The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 17th day of December, 2008.